**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. RDB-23-0126** |
| **AL TARIQ SMITH** | |
| **Defendant** | |

**GOVERNMENT'S RESPONSE TO**
**DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE**

Erek L. Barron
United States Attorney

James I. Hammond
Special Assistant United States Attorney

Michael C. Hanlon
Assistant United States Attorney

36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201
410-209-4800

# TABLE OF CONTENTS

I.   INTRODUCTION………..………………………………………………….…………3

II.  STATEMENT OF FACTS……………………………………………….…………….3

III. ARGUMENT …………………………………………………………….……………8

    A.   The Police Discovered the Firearm Before Any "Seizure" of the Defendant Had Taken Place; Only After the Firearm was Recovered Did the Police Detain and Arrest the Defendant……………………………………………………………8

    B.   Even If Some Fourth Amendment Seizure Occurred, the Police Acted Lawfully Under the Community Caretaker Exception and the Exigent Circumstances Exception to the Warrant Requirement……………………………………….…14

    C.   The Firearm Was Not Discovered as a Result of Any Seizure………..…………16

    D.   The Recovered Items From the Defendant's Vehicle Are Admissible Under the Automobile Exceptions to the Warrant Requirement (the *Carroll* Doctrine) and as a *Gant* Search Incident to a Lawful Arrest…………………………………....17

        1.   *Carroll* Doctrine………………………………………………….………17

        2.   *Gant* Search Incident to a Lawful Arrest………………………………...20

    E.   Officers Had Reasonable Articulable Suspicion to Detain and Further Investigate the Defendant Upon Observing the Handgun in Plain View on the Center Console of the Defendant's Vehicle………………………………………………………22

IV.  CONCLUSION…………………………………………………………………… 27

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. RDB-23-0126** |
| **AL TARIQ SMITH** | |
| **Defendant** | |

---

**GOVERNMENT'S RESPONSE TO**
**DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE**

The United States of America, by and through its attorneys Erek L. Barron, United States

Attorney for the District of Maryland, and James I. Hammond, Special Assistant United States

Attorney, and Michael C. Hanlon, Assistant United States Attorney, for said District, submits this

Response to Defendant's Motion to Suppress Physical Evidence.

## I.  INTRODUCTION

On April 6, 2023, Al Tariq Smith ("Defendant") was charged by indictment with one count

of Possession of Ammunition by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1). The

Defendant filed a Motion to Suppress Physical Evidence on September 14, 2023 (ECF No. 34).[1]

As discussed more fully below, the motion should be denied.

## II.  STATEMENT OF FACTS

On January 17, 2023, at around 9:07 a.m., a Baltimore City 911 caller reported that there

was a gray Jeep that had been parked at pump six at the Clark gas station since 2:00 a.m. with

---

[1]     The Defendant also filed a motion to suppress statements. ECF No. 35. At this time, the
Government has not discovered any inculpatory statements the Defendant made in response to any
questioning by law enforcement, nor does the Government intend to sponsor any statements made
by the Defendant at trial.

someone inside. The 911 caller stated: "there has been a car that has been here in the lot by the pump, pump six, from around 2:00 in the night, and somebody is in there, I do not know what is going on [unintelligible]. It's a Jeep, gray. From 2:00 a.m."  In response, Baltimore Police dispatch reported the following: caller reporting a gray Jeep parked at pump #6 since 2:00 a.m., driver inside, caller is concerned. *See* Exhibit 1 (911 call); Exhibit 2 (BPD computer-aided dispatch report).

At approximately 9:28 a.m., officers with the Baltimore Police Department responded to the Clark gas station (located at 1101 West North Avenue, Baltimore City, Maryland) for a wellness check on the reported person who had been at the pump since 2:00 a.m. Upon arrival, Ofc. Dollard parked next to the gray Jeep (which was later found to be the Defendant's vehicle). Ofc. Austin parked next to the sidewalk a good distance away from the gas pumps. Ofc. Gibbs parked near the convenience store. Photos[2] of the gas station and the positions of the police vehicles are below:

---

[2]     Photos 1 and 2 are still shots from a BPD Citiwatch camera that was positioned nearby. BPD obtained the video in connection with a use of force investigation following the incident.



*Photo 1 – Clark gas station, January 17, 2023*



***Photo 2 – Same view as above but zoomed in with focus on pumps.***

In Photo 2 above, the Defendant's vehicle is circled in red. Ofc. Dollard's dark sedan patrol vehicle (with its headlights on) is parked just to the right of the Defendant's vehicle. Ofc. Gibbs's white SUV patrol vehicle is seen in the photo above behind Ofc. Dollard's vehicle and to the upper right from the Defendant's vehicle. Finally, Ofc. Austin's white SUV patrol vehicle is parked furthest to the right facing the camera. Photo 2 shows a BPD transport van entering the parking lot behind Ofc. Austin's parked vehicle.



***Photo 3: Screenshot is from Ofc. Austin's body worn camera as***
***the three officers approached the Defendant's vehicle for their wellness check***

Body-worn camera video for the officers (Ofc. Dollard's BWC attached as Exhibit 3 and Ofc. Gibbs' BWC attached as Exhibit 4) shows the basic chronology of the events:

- At 09:22:46, Ofc. Dollard's BWC showed him approaching the driver's side of the Defendant's vehicle and observing the Defendant unresponsive in the driver's seat. The doors to the vehicle were locked and no one else was inside of the vehicle.

- Meanwhile, Ofc. Gibbs approached the front passenger side window (approximately 09:22:52 on Gibbs' BWC).

- For about 30 seconds (Dollard BWC 09:23:09 to 09:23:39 ), Ofc. Dollard attempted to rouse the Defendant by repeatedly knocking on the window, asking the Defendant if he was okay, and requesting the Defendant wake up.

- As seen on Gibbs BWC (Gibbs at 09:23:39), after those approximately 30 seconds, Ofc. Gibbs observed in plain view on top of the center console a black handgun. Ofc. Gibbs relayed to Ofc. Dollard that "hey, he's got a gun." Ofc. Gibbs' statement to Ofc. Dollard can be heard on Dollard's BWC (09:23:39) and on Gibbs's BWC (09:23:39).

- *After* observing the firearm in the car, Ofc. Gibbs drew his firearm. The sound of Gibbs unholstering his weapon can be heard on his BWC a few seconds after alerting Dollard about the gun (Gibbs BWC: statement about gun at 09:23:39; Gibbs unholstering own weapon at 09:23:43).

- Following Gibbs's observation of the firearm, Ofc. Dollard continued his attempts to awaken the Defendant who eventually woke up and unlocked the door (Dollard BWC at 09:23:39-09:23:47). Ofc. Dollard opened the driver's door, ordered the Defendant out of the vehicle, removed the Defendant's seatbelt, and assisted the Defendant out of the vehicle by grabbing one of his arms.

Ofc. Austin approached from the rear of the vehicle and handcuffed the Defendant upon him exiting the vehicle.

Ofc. Gibbs recovered the handgun he previously observed. The weapon was determined to be a black Polymer80 Inc. model PF940C 9mm privately manufactured firearm with no serial number. The weapon was loaded with 15 rounds of ammunition. Ofc. Gibbs rendered the weapon safe.

The Defendant argues that the seized items from the vehicle are the result of an illegal search due to a lack of probable cause or a warrant. The argument is without merit and should be denied.

### III. <u>ARGUMENT</u>

The Fourth Amendment to the United States Constitution protects citizens from "unreasonable searches and seizures." U.S. Const. amend IV; *see also Mapp v. Ohio*, 367 U.S. 643, 655 (1961) (applying the Fourth Amendment to the States).

In this case, police recovered the firearm in question while they were responding to a 911 call reporting a person who had been seen sitting in a car for some seven hours. Under the circumstances, there were good reasons to believe that the person might be in distress or need help. The police approached the vehicle, later identified as the Defendant's, and observed the firearm in plain view inside the Defendant's car before the officers had seized the Defendant in any way or engaged in any Fourth Amendment action. Because no Fourth Amendment seizure or search took place before the discovery of the firearm, any motion to suppress should be denied.

**A.   The Police Discovered the Firearm Before Any "Seizure" of the Defendant Had Taken Place; Only After the Firearm was Recovered Did the Police Detain and Arrest the Defendant.**

In order for any Fourth Amendment protections to apply, law enforcement must actually engage in a seizure or search as those terms are defined under Fourth Amendment law. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991). A person has been "seized" under the Fourth Amendment "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980). It is well established that a seizure does not occur merely because police approach or talk to a person on the street. *See, e.g., Florida v. Bostick*, 501 U.S. 429, 439 (1991).

In this case, the initial police approach to the Defendant's vehicle was not a Fourth Amendment "seizure" at all because the police did not do anything that would have caused a reasonable person in the Defendant's position to believe they were not free to leave. *See Brendlin v. California*, 551 U.S. 249, 254 (2007). The BWC videos of Officers Dollard and Gibbs show that the officers did only the following prior to the discovery of the firearm: Ofc. Dollard approached the driver side of the Defendant's vehicle (Dollard BWC at 09:22:46); Ofc. Gibbs approached the passenger side of the Defendant's vehicle; Ofc. Dollard knocked on the Defendant's driver side window to try to get his attention; Ofc. Dollard said "you alright" and "wake up." Ofc. Gibbs's BWC shows that the Defendant appears to have been asleep during the officer's approach and did not respond and apparently did not even notice Ofc. Dollard on the driver side at all prior to the police accessing the vehicle (which occurred *after* the firearm was discovered by Ofc. Gibbs on the passenger side).

None of this was consistent with a "seizure" given the nature of the police action in this case. Everything that the police did was necessary and appropriate in order to carry out their goal that day: to conduct a wellness check on the Defendant in response to the 911 call. There is nothing that the police did that was inconsistent with their wellness check (prior to observing and

9

recovering the firearm, by which point they were justified in taking the actions they did, as discussed below). Quite literally, all they did was approach the vehicle and knock on the driver side window to try to get the Defendant's attention.

The Defendant claims he was immediately under arrest. To the contrary, however, the Defendant was not "seized" for purposes of a Fourth Amendment analysis until Ofc. Dollard grabbed the Defendant's arm and assisted him out of his vehicle – which occurred *after* the firearm was observed by Ofc. Gibbs. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015) (citing *Terry,* 392 U.S. at 19 n. 16). Ofc. Dollard repeatedly knocking on the windows, asking if the Defendant was alright, and requesting that the Defendant wake up did not constitute a seizure because when "physical force is absent, a seizure requires both a 'show of authority' from law enforcement officers and 'submission to the assertion of authority' by the defendant." *Id.* (citing *California v. Hodari D.* 499 U.S. 621, 626 (1991)). Ofc. Dollard and Ofc. Gibbs (in their community caretaking function as discussed in the next section) were concerned about a person who had been stopped at a gas pump for seven hours and who (when the police arrived) appeared to be asleep at the wheel of the vehicle.

Not only were the officers not displaying a show of authority, but the Defendant was hardly in a state to acknowledge the officers' presence, let alone submit (acquiesce) to any assertion of authority. Even prior to observing the handgun, officers were well within their legal authority to identify the Defendant, check the vehicle registration, determine if he possessed a valid license, and determine if he was impaired or capable of safely operating a motor vehicle.

By the time a seizure occurred (by Ofc. Dollard taking the Defendant out of the car), police had already observed the firearm (Gibbs had seen it from the passenger side) and the officers were confronted with a person locked inside of a vehicle, potentially under the influence of alcohol and/or drugs, with an unknown mental state, and with immediate access to a handgun in plain view next to them. At that time, it was quite reasonable (and consistent with the Fourth Amendment) for Ofc. Dollard to remove the Defendant's seatbelt, assist him out of the vehicle, and handcuff the Defendant to keep him from accessing the firearm or any other contraband or weapons while further investigating the situation. More importantly, it was reasonable because officers had probable cause at that point to arrest the Defendant (as discussed below).

Notably, numerous key circumstances usually associated with a Fourth Amendment detention *did not occur* prior to the firearm being observed. The officers did not command the Defendant to stay put. They did not order the Defendant to get out of his car. They did not give any commands to the Defendant. They did not have their weapons drawn. They did not have their handcuffs out. They did not do anything aggressive or intimidating. As stated, all they did was approach the vehicle and knock on the glass. It is difficult to conceive of how the police could have done *less* in order to effectuate their purpose – which again was to conduct a welfare check.

Indeed, because the Defendant was asleep up through when the police first observed the firearm, *nothing* the police did could possibly have caused the Defendant to believe he was not free to go. The BWC video indicates that the Defendant was not even awake or aware of either officer until *after* Ofc. Gibbs observed the firearm and the decision was made to open the car doors, remove the weapon, and detain the Defendant. Under *Mendenhall* and its progeny, there is no way that any police conduct could cause a sleeping defendant to believe that he was not free to go.

Hence, no seizure took place until *after* the gun was discovered by Ofc. Gibbs, who observed it in plain view in the Defendant's vehicle.

The defense points to several items in an attempt to make the police conduct into a seizure or into something other than a call for service to render assistance. All of the defense's points ultimately are disproven by the fact of the 911 call (which was the reason the police were there) and the police conduct that day. Specific defense points fail for the following reasons. First, the defense incorrectly calls the officers' approach of the Defendant's vehicle an "ambush." The police conduct here was nothing of the sort. Quite to the contrary, the police were responding to a call for service to see if the Defendant needed assistance. This was the opposite of an "ambush."

Second, the defense incorrectly characterizes the manner in which the police positioned their vehicles. The suggestion that the officers strategically parked their patrol vehicles so that the Defendant could not escape ignores the reason that the police were there that morning. They were there in response to a call for service seeking *assistance* for the Defendant. The defense suggestion is also contradicted significantly with the above photographs (Photos 1 and 2). There is simply nothing particularly "strategic" about the placement of the vehicles. The officers' cars are parked near the Defendant's, at locations where any normal person would park their car if they were there to check on the vehicle at the gas pump.

Moreover, the Defendant's car was not blocked in. Had the Defendant been awake and wished to, there was plenty of space for him to pull forward and turn to the left (where there were no police cars) or to the right (where the police car near the Clark mart was pulled over near the store and left room for any vehicle to pass). There was also nothing preventing the Defendant from backing out from the pump. None of the police cars were blocking the Defendant's vehicle.

Third, the defense's reliance on the fact that one of the officers unholstered his weapon is also unavailing. Ofc. Gibbs temporarily unholstered his firearm only after observing the handgun next to the Defendant. By that point, the firearm in question had already been observed in plain view (and, as discussed, probable cause existed for its recovery).

Moreover, even assuming that the police in this case engaged in *any* conduct prior to the identification of the weapon that might arguably constitute some "seizure," any such police conduct was justified by the officers' community caretaker functions.  As stated, and contrary to the defense characterization, the police in this case were not engaged in a criminal investigation. That issue is discussed in greater detail below.

As soon as Ofc. Gibbs saw a handgun in plain view on the center console next to the Defendant absent any enclosed case or holster, officers had probable cause to arrest the Defendant for violating state laws about transporting a handgun in a vehicle. None of the enumerated exceptions allow a person to dangerously transport a handgun openly in a vehicle as the Defendant was observed doing in this case. Moreover, once the police actually made contact with the Defendant, his behavior demonstrated that he was likely intoxicated, which further justified his arrest, even if he were issued a handgun permit, under Md. Code Ann., Public Safety § 5-314. The Defendant's intoxication therefore also justified the seizure of the firearm.

At bottom, this is a situation in which the police did nothing except attempt to check on a citizen's welfare to see whether they needed help. The police were carrying out that function when they observed – in plain view in the Defendant's car – the handgun that is the subject of this case. The police were not there to investigate a crime, or gather evidence, or make an arrest. Indeed, upon arrival at the scene the police did not even believe that they would be doing any of those things. While attempting to make contact with a citizen, the police saw that he had a gun. It was

not conduct by the police that led to the events in this case. Rather, it was the Defendant's conduct – his unexplained presence for hours at the gas station, his falling asleep at the wheel of his car, and his decision to have a gun plainly visible for anyone to see – that led to the discovery of the gun. Therefore, the motion should be denied.

> **B.      Even If Some Fourth Amendment Seizure Occurred, the Police Acted Lawfully Under the Community Caretaker Exception and the Exigent Circumstances Exception to the Warrant Requirement.**

An exception to the Fourth Amendment warrant requirement is when police engage in a warrantless search pursuant to their "community caretaking functions." *See Hunsberger v. Wood*, 570 F.3d 546, 553 (4th Cir. 2009). A separate exception exists when police engage in action due to "exigent circumstances." *Id.* at 555. Both exceptions apply in this case.

The "community caretaker" exception focuses on the "function" carried out by police during the action – specifically, whether the police engage in a function "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 554. The Fourth Circuit has stated that when analyzing the distinction between the "community caretaker" exception and the "exigent circumstances" exception, courts may analyze the "programmatic purpose" of the police action, including any standard policies. *Id.* Even if there were some other means that might have been available to the police, the "fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable. *Id.* (quoting *Cady v. Dombrowski*, 413 U.S. 433, 447 (1973)).

In this case, "function" of the police response to the Clark gas station was to check on a citizen, not to conduct a criminal investigation. The 911 call and the resulting police dispatch gave no hint of a possible crime and invited no criminal investigation; it drew first responders' attention

to a possible person in need of help. The police responded to check on a citizen's welfare. Their response was thus completely "divorced" (*Hunsberger*, 570 F.3d at 554-555) from any criminal investigative goal. Both the law and common sense permitted the police to approach the Defendant's car. *See also United States v. Cintron*, 592 F.Supp.2d 198, 202 (D. Mass. 2008) (finding no Fourth Amendment violation where police opened a car door to check on car occupant: "Opening the door and shaking Cintron to awaken him also did not violate the Fourth Amendment because of the community caretaker doctrine. That act was not undertaken by the state police as part of their investigation but rather out of concern for Cintron's safety.") (internal citations omitted); *Winters v. Adams,* 254 F.3d 758, 763–64 (8th Cir. 2001) (in civil §1983 action, reversing district court's finding that police had violated constitutional rights and upholding police decision to extend detention of person on suspicion they were intoxicated: "In the instant case, the appellee argues that the police officers were required simply to walk away from appellee's vehicle, thus perhaps permitting a possibly intoxicated individual to drive the vehicle, potentially harming himself and other citizens. The Court simply cannot conclude that the strictures of *Terry* and its progeny compel such a result…this Court finds that Officers … "would have been derelict in their duties" had they not detained appellee…") (internal citations omitted).

To be certain, once the police observed the firearm in the Defendant's car, the circumstances changed and a criminal investigation ensued. But their initial response – even if seen as a seizure – was in a community caretaking role. The function only changed after the key piece of evidence in this case (the firearm) was discovered.

Likewise, the exigent circumstances exception applied in this case as well. For that exception to apply, the circumstances must create an "objectively reasonable belief that an emergency existed or that required immediate entry to render assistance or prevent harm to persons

or property within." *Hunsberger*, 570 F.3d at 555 (quoting *United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992)).

Here, the circumstances already discussed provided the responding officers with reason to believe that there were exigent circumstances justifying their arrival at the gas station and the actions they undertook. A car with an occupant sitting at a gas pump for seven hours is good cause for concern. Any reasonable first responder would believe that someone might need aid. The police arrival and approach were designed to provide such aid.

In sum, even assuming that the police had engaged in some kind of seizure of the Defendant prior to seeing the firearm (which they did not), any police conduct was wholly justified by the fact that they were checking on a person's welfare. Given their goals and function, the police were right to approach the Defendant's car, to try to get his attention, and to access the vehicle in order to determine the Defendant's state and whether he needed medical or other assistance. The Fourth Amendment permitted those efforts.

Indeed, it is difficult to conceive of how the police could have carried out their duties better in this case. The police were right to approach the Defendant's car. Had the police not approached the vehicle and made contact with the Defendant, many would argue that they had *failed* to carry out their duty to check on the welfare of a citizen. The police conduct here – even if found to be a seizure – was proper.

### C.    The Firearm Was Not Discovered as a Result of Any Seizure.

Additionally, and again assuming that some kind of Fourth Amendment "seizure" occurred as a result of the police approaching the Defendant and his car, the discovery of the firearm was not the "fruit" of any such seizure.

In order for an alleged Fourth Amendment violation to support the suppression of evidence, the discovery of the evidence must of the result (that is, the "fruit") of the alleged violation.

Here, any "seizure" of the Defendant by the police did not bring about the discovery of the firearm. Ofc. Dollard interacted with the Defendant on the driver side of the Defendant's car. Regardless of whatever conduct Ofc. Dollard engaged in that even *arguably* constituted some seizure, Ofc. Gibbs was separately approaching the passenger side of the Defendant's car. Ofc. Gibbs was the only officer who observed the firearm (in plain view) and then alerted Ofc. Dollard. Ofc. Gibbs saw the firearm because he was standing at the passenger side of the Defendant's car, not because of any "seizure" of the Defendant from the driver's side officer.

**D.    The Recovered Items From the Defendant's Vehicle Are Admissible Under the Automobile Exceptions to the Warrant Requirement (the *Carroll* Doctrine) and as a *Gant* Search Incident to a Lawful Arrest**

Once Ofc. Gibbs observed the firearm in the Defendant's car, police had probable cause to believe that the Defendant had committed Maryland firearms violations and that contraband pertaining to those violations were in the car. Indeed, as discussed below, the police had observed the firearm in plain view from outside the Defendant's car. Probable cause having been established by the presence of the firearm, police were permitted to seize the firearm and to conduct a further search of the vehicle on at least the following two grounds.

1.    *Carroll* doctrine

It is well established under *Carroll v. United States*, 267 U.S. 132 (1925) and its progeny that police may search a vehicle, even without a warrant, when they have probable cause to believe it contains contraband. Under the *Carroll* rule, police may search the entire vehicle (including the trunk and contents located within) where it is reasonable to believe the contraband could be located. *Id. See also Wyoming v. Houghton*, 526 U.S. 295, 302 (1999) ("[w]hen there is probable

cause to search for contraband in a car, it is reasonable for police officers . . . to examine packages and containers without a showing of individualized probable cause for each one.").

The aforementioned plain view exception sometimes goes hand-in-hand with the *Carroll* doctrine. In order for the plain view exception to be valid, a three-prong test was introduced by *Horton v. California*, 496 U.S. 128 (1990). First, the police officer's initial intrusion must be lawful, or the officer must otherwise properly be in a position from which he or she can view a particular area. *Id*. at 136-37. Second, the incriminating character of the evidence must be "immediately apparent." *Id*. Third, the officer must have a lawful right of access to the object itself. *Id*.

Here, the plain view observation of the firearm provided probable cause to believe that multiple state law violations had occurred. Maryland law prohibits a person from wearing, carrying, or knowingly transporting "a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, or airway of the State." Md. Code Ann., Crim. Law § 4-203(a)(1)(ii). The statute provides for certain conditions under which a person is permitted to carry a firearm, including members of law enforcement and military, and handgun permit holders. *See id.* at § 4-203(b). However, regardless of whether the person qualifies for an exception under subsection (b), under Maryland law three things are clear: 1) if a person is law enforcement or military, and carries a firearm while on active duty, they must secure the handgun on their person in accordance with organizational policy; 2) if a person is a civilian who has been issued a handgun permit, that person must conceal the handgun from view on their person under or within an article of clothing or within an enclosed case; and 3) if a person does not fall into the previous two categories, but wishes to transport a handgun in their vehicle for various activities such as hunting or target shooting or to a shop to sell, consign, or repair the handgun, the

handgun must be unloaded and must be carried in an enclosed case or an enclosed holster. *See id*. at subsection (b); *see also* Md. Code Ann., Public Safety § 5-307.

Accordingly, all three prongs of *Horton* are met in the instant case. Ofc. Gibbs was responding to a call for service; he was standing outside the Defendant's car, and the door was still closed, and therefore the officer was clearly, lawfully in a position to observe the handgun in plain view on the center console of the Defendant's vehicle; and Ofc. Gibbs notified Ofc. Dollard upon observing the handgun. A handgun not in a case or holster in plain view inside of a vehicle made it immediately apparent to the officers that the Defendant was not complying with Maryland law. Finally, that observation of the handgun constituted more than probable cause causing an officer to believe that the Defendant's vehicle contained contraband pertaining to an offense. The recovery of the handgun was therefore lawful.

The Defendant argues that being a felon in possession of a firearm is not the default status and that someone openly carrying a firearm cannot justify an investigatory detention. The defense cites *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013) for that proposition. The problems with *Black* and the Defendant's reliance on it here are obvious. First, North Carolina law[3] permits, and officers in *Black* testified, that North Carolinians are allowed to openly carry firearms on their person, which contrasts materially with § 4-203 of the Maryland Criminal Law Article (As discussed §4-203 specifically prohibits the wearing, carrying, or transporting of a handgun, whether concealed or open, on or about the person). *Id*. at 535. Second, the *Blake* defendant was not openly carrying a firearm, but had one concealed on his person. *Id*. at 536. Third, Black was told by an officer he was not free to leave (which never happened here). *Id*. Fourth, and most distinguishing here, is that *Black* involved a pre-textual stop on a mere hunch based on that

---

[3]        *See generally* N.C. Gen. Stat. §§ 14-415.10 to 14-415.23.

defendant's proximity to someone who was openly carrying a firearm. *Id.* at 539. Contrast with the instant case, in which officers responded in their community caretaking function to a call for service to check on the wellbeing of the Defendant. A handgun was in plain view in the vehicle next to him in non-compliance with Maryland handgun transport laws. *Black* is inapplicable to this factual scenario.

2.    <u>*Gant* Search Incident to a Lawful Arrest</u>

Police may conduct a warrantless search incident to a lawful arrest if there is a reasonable possibility that evidence of the offense of arrest might be found in the vehicle. *Arizona v. Gant*, 556 U.S. 332 (2009). When probable cause exists to make an arrest of a recent occupant of a vehicle, it is reasonable under the Fourth Amendment to allow officers, in order to ensure their safety and to preserve evidence, to warrantlessly search the entire passenger compartment of the vehicle and any containers therein contemporaneous with the arrest. *United States v. Thornton*, 541 U.S. 615 (2004). *See United States v. Bush*, 404 F.3d 263, 275-76 (4th Cir. 2005) (Because officers saw passenger exit Jeep just before entering bank, and because passenger was in the process of reentering Jeep at the time of her arrest, officer was permitted to search Jeep incident to passenger's arrest).

Police may make a warrantless arrest of a person if they have probable cause to believe that the person has committed a felony or that the person had committed a misdemeanor in police presence. *See Maryland v. Pringle*, 540 U.S. 366, 369-70 (2003).

In this instance, officers had probable cause to arrest the Defendant upon observing the handgun for the aforementioned Maryland state law violations. The arrest of the Defendant at that time was therefore lawful (for the same reasons and under the same Maryland law violations as discussed in the *Carroll* doctrine section). At that moment it was reasonable under *Thornton* and

*Gant* to search the vehicle for additional contraband of those crimes (in addition to there being probable cause to search the car as discussed above). Ofc. Gibbs or another officer on scene would have been well within that legal right to recover the firearm upon observing it or after their investigation. Option one proved to be the safest option in this case.

The Defendant relies on the unpublished opinion of *United States v. Graham*, 686 F. A'ppx 166 (4th Cir. 2017), as instructive on why there was no probable cause in the instant case to believe the Defendant's vehicle contained contraband or evidence of a crime at the time of the search. *Graham* is distinguishable from the instant case. First, the *Graham* trial court did not reach a conclusion about the *Carroll* doctrine or *Gant* exception, but instead relied on exigent circumstances. Most of *Graham* reviews the inapplicableness of the exigent circumstances exception with respect in that case to the preservation of evidence; the government does not suggest that the police arrival and response to the Clark station was motivated or justified by an exigency concerning the preservation of any evidence.[4]

Second, Graham was arrested on an open warrant and already safely detained away from the vehicle. Neither *Gant* exception applied in Graham's case whereas in the instant case, the Defendant was arrested for illegal possession of a handgun, so observing a handgun in plain view in the Defendant's vehicle certainly applies to the second exception "when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Thornton v. United States*, 541 U.S. 615, 631 (2004).

Finally, the *Graham* court touched on the applicability of the *Carroll* doctrine. In *Graham*, there was no testimony or record made at the motions hearing about potential state law violations

---

[4]     As discussed above, the community caretaker efforts and exigent circumstances at play here had nothing to do with evidence or investigation.  The police responded to the Clark station to check on the welfare of a citizen, not to preserve or seek evidence.

for illegally possessing a firearm, just open containers and parking violations. Therefore, the suppression court found that the record did not contain a reliable factual basis to find for the Government on that exception. In the instant case, there were clear observations made by Ofc. Gibbs's as to potential state law violations prior to recovering the handgun, *i.e.* transporting a handgun in a vehicle without securing it in a case or holster. The *Carroll* doctrine, as well as *Gant*, are therefore applicable in this case.

> ### E.   Officers Had Reasonable Articulable Suspicion to Detain and Further Investigate the Defendant Upon Observing the Handgun in Plain View on the Center Console of the Defendant's Vehicle.

The aforementioned sections have discussed the fact that there was no seizure in any form until the gun was observed by the police.  Once the gun was observed, probable cause existed for everything that the police did – seizing the weapon, detaining and arresting the Defendant, searching the car.  The Defendant was not seized prior to the gun being observed, and even if he was, any "seizure" of the Defendant on the driver side of the car was not what precipitated the observation of the gun from the officer on the passenger side.

That said, the police actions taken in connection with the detention and arrest of the Defendant were appropriate (even though the seizure of the Defendant's person is not the relevant Fourth Amendment issue with respect to the gun). Even though officers had probable cause to arrest the Defendant, officers continued to investigate the situation based on reasonable articulable suspicion that further criminal activity was afoot.

A warrantless arrest made in a public place is not unreasonable and does not violate the Fourth Amendment if there is probable cause to believe that the individual has committed a felony or a misdemeanor in an officer's presence. *United States v. Watson*, 423 U.S. 411, 418 (1976). The Supreme Court has identified three distinct types of police-citizen encounters, each requiring a

different level of suspicion to be deemed reasonable under the Fourth Amendment: "(1) arrest, which must be supported by probable cause; (2) brief investigatory stops, which must be supported by reasonable articulable suspicion; and (3) brief encounters between police and citizens, which require no objective justification." *United States v. Brown*, 401 F.3d 588, 592 (4th Cir. 2005). Whether an officer had probable cause is evaluated based on the "totality on the circumstances," not a "divide-and-conquer analysis." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). Individually, such factors are often "readily susceptible to innocent explanation" but may collectively amount to probable cause. *Id.*

Additionally, not all officers of the investigative team need to have direct knowledge of the factual universe that creates the probable cause to effectuate an arrest. "The collective knowledge doctrine applies when at least some, but not all, of an investigative team has actual knowledge of facts necessary to a finding of probable cause." *United States v. Blauvelt*, 638 F.3d 281, 289 (4th Cir. 2011). "The knowledge is imputed from one officer to another such that the officers collectively are assumed to have actual knowledge of the imputed fact[s]." *Id. See also United States v. Wells*, 98 F.3d 808, 810 (4th Cir. 1996) ("[A]lthough the agent who actually seized the weapon pursuant to the supervising agent's instructions had no personal knowledge that Wells was a convicted felon, it is sufficient that the agents collectively had probable cause to believe the weapon was evidence of a crime at the time of the seizure.")

In this case, the police acted in conformity with the Fourth Amendment at every step of their investigation, up through and including the discovery and recovery of the firearm in question.

An investigatory stop is authorized when "the officer has reasonable suspicion, supported by articulable facts, that criminal activity 'may be afoot.'" *Terry v. Ohio*, 392 U.S. 1, 30 (1968). In assessing whether a police officer had reasonable suspicion, a court looks at "the totality of the

circumstances" to determine whether the officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). It requires "some minimal level of objective justification," *I.N.S. v. Delgado*, 466 U.S. 210, 217 (1984), but "'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 396–97 (2014) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Reasonable suspicion means "specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008). "Judicial review of the evidence offered to demonstrate reasonable suspicion must be commonsensical, focused on the evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement." *Id.* at 337. Because the intrusion created by an investigative stop is minimal, the reasonable suspicion standard is not onerous. *United States v. Glover*, 662 F.3d 203, 209-10 (4th Cir. 2011). Whether there is reasonable suspicion depends on the totality of the circumstances known to the officer at the time the stop is made, along with any reasonable inferences to be drawn at the time of the stop. *United States v. Crittendon,* 883 F.2d 326, 328 (4th Cir. 1989).

A police officer who lacks probable cause to arrest is not required to "simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145, (1972). Instead, a brief stop "in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Id.* at 146. The Supreme Court recognized that "officers can detain

individuals to resolve ambiguities in their conduct." *Wardlow*, 528 U.S. at 120 (referencing *Terry*, 392 U.S. at 30).

Upon further investigation, officers learned that in addition to violating state handgun transport law, the Defendant was prohibited from possessing a firearm and ammunition in violation of state and federal law. *See* Md. Public Safety Code Ann. §§ 5-133 and 5-133.1 and 18 U.S.C. § 922(g)(1).

The Supreme Court acknowledged that the right to conduct an "investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The Supreme Court in *Michigan v. Long*, 463 U.S. 1032 (1983), stressed that a *Terry* stop "involves a police investigation at close range, when the officer remains particularly vulnerable in part because a full custodial arrest has not been effected, and the officer must make a quick decision as to how to protect himself and others from possible danger." *Id.* at 1052 (citing *Terry*, 392 U.S. at 24, 28). The use of handcuffs does not turn a *Terry* stop into an arrest and was recently reaffirmed in *States v. Ruffin*, 814 F. App'x 741, 749 (4th Cir. 2020), where the Court explained that "[i]t is well established in this circuit that 'handcuffing a suspect . . . does not necessarily elevate a lawful [*Terry*] stop into a custodial arrest.'" *Id.* (citing *United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007). The Court explained that "the reasonableness of handcuffing a suspect during a *Terry* stop depends on whether doing so is 'necessary to maintain the status quo and protect [officer] safety.'" *Id*.

Here, the use of handcuffs were reasonable to use in effectuating a *Terry* stop of the Defendant. First, it was the safest manner for officers to conduct a *Terry* stop given the circumstances. This was a dangerous situation for the officers. The Defendant's mental state was unknown to the officers and the officers became aware that the Defendant had immediate access

to a handgun. Second, the use of handcuffs helped alleviate any attempt by the Defendant to flee, thereby thwarting officers' intention of investigating Defendant's purpose at the gas station and, at a minimum, the illegal transportation—and possession—of the firearm on the center console next to the Defendant. The handcuffs—and eventual leg shackles—proved to be of significant importance in this case later on.

Shortly after arrival, the officers observed a handgun that is potentially loaded and not in an enclosed case or an enclosed holster as required by state law. They also had not been able to identify the Defendant to determine if he had a handgun permit or if he was prohibited from possessing a firearm. Officers know through their training, knowledge, and experience that prohibited persons tend to not properly store their handguns in cases or holsters whether on their person or in a vehicle. To end this point without belaboring further, the officers had probable cause to arrest the Defendant, and certainly had reasonable suspicion to detain the Defendant pending their investigation.

The Fourth Amendment places no rigid, fixed limitation on the length of a *Terry* investigative detention. *United States v. Place*, 462 U.S. 696 (1983); *United States v. Sharpe*, 470 U.S. 675 (1985). An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983). The test articulated by the *Sharpe* Court is did the police diligently pursue a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant? 470 U.S. at 686 (upholding 20-minute detention).

Within about a minute-and-a-half of seizing the Defendant, Ofc. Dollard is able to locate the Defendant's state ID and requests dispatch to run the name, date of birth, and soundex number. While dispatch is looking up that information, Ofc. Dollard uses Ofc. Gibbs's computer in his

26

patrol vehicle to investigate the Defendant further while dispatch was assisting another officer. Ofc. Dollard learns that the Defendant has only been issued a state ID and not a valid driver's license or learner's permit. At this point, the Defendant has been detained for approximately four-and-one-half minutes. Ofc. Dollard eventually called the Maryland State Police Gun Center and confirmed that the Defendant is prohibited from possessing a firearm. The officers now have additional probable cause to charge the Defendant for illegal possession of a firearm and other incarcerable and non-incarcerable traffic offenses. The length of detention was about as expeditious as technologically possible; one might even say a model in *Terry* detention expediency.

## IV.    <u>CONCLUSION</u>

For all the foregoing reasons, the motion to suppress physical evidence filed by the Defendant should be denied.

Respectfully submitted,

Erek L. Baron
United States Attorney

_____/S/_____
James I. Hammond
Special Assistant United States Attorney

Michael C. Hanlon
Assistant United States Attorney

36 South Charles Street, Fourth Floor
Baltimore, Maryland 21202
410-209-4800

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 26th day of February, 2024, a copy of the foregoing Government's Response to Defendant's Motion to Suppress Physical Evidence was served via the ECF filing system to counsel of record.

_____/S/_____
James I. Hammond
Special Assistant United States Attorney
