**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES** | |
| **v.** | **NO. 1:23-CR-126-RDB** |
| **AL TARIQ SMITH** | |

**REPLY IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT ON
SECOND AMENDMENT GROUNDS**

Mr. Smith filed a motion to dismiss the indictment, both facially and as applied. ECF 36. The government filed a response. ECF 50. Mr. Smith here files a brief reply.

I.      ***Bruen* Controls And The Court Must Conduct The Analysis *Bruen* Requires.**

The government argues that the Court should follow *United States v. Moore*, 666 F.3d 313, 318 (4th Cir. 2012),  and prior Supreme Court dicta. ECF 50 at 5-9. The government's analysis is wrong.

The government acknowledges that *Bruen* did a full historical analysis of concealed-carry laws notwithstanding *Heller*'s dictum that such laws are presumptively lawful. It gives two reasons that this doesn't undermine *Moore*'s reliance on *Heller*'s dictum about felon-disarmament laws.

*First*, the government says, "Unlike the historical concealed-carry laws mentioned by *Heller*, however, the New York licensing scheme banned 'public carry altogether.'" ECF 50 at 8. But the *Bruen* Court discovered the relevance of that fact <u>only by doing a full historical analysis</u>. *Heller* said, in categorical terms, that "prohibitions on carrying concealed weapons" are "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26. In *Bruen*, the Supreme Court acknowledged that *Heller* overstated the historical record: "***In fact, however***, the history reveals a consensus that States could *not* ban public carry altogether. Respondents' cited opinions agreed

1

that concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open carry*." 597 U.S. 1, 53 (2022) (first emphasis added). Crucially, the *Bruen* Court would never have discovered this important historical distinction *unless it had done a comprehensive historical analysis*. In other words, *Bruen* didn't just defer to *Heller*'s dictum about concealed-carry bans. Instead, it actually undertook the historical research, and then, *based on that research*, concluded New York's law was unlike the laws referenced in *Heller*. Translated to Mr. Smith's case, that means this Court must do the full historical analysis of § 922(g)(1). Because *Moore* simply considered the matter settled based on *Heller*'s dictum, that case has been abrogated by *Bruen*.

*Second*, the government says, "unlike laws dispossessing felons, the New York scheme burdened the firearm-carry rights of 'ordinary, law-abiding, adult citizens.'" ECF 50 at 8. That is irrelevant. It does not matter that New York's law applied only to law-abiding, responsible citizens. What matters is that the *Bruen* Court did not uncritically defer to *Heller*'s passing statement that concealed-carry bans are constitutional, but instead rolled up its sleeves and conducted the full historical inquiry. Mr. Smith is not saying that concealed-carry bans and § 922(g)(1) are similar in any substantive way (*i.e.*, in terms of the conduct they proscribe). Mr. Smith is only saying they are similar insofar as *Heller* refers to both of them—without any analysis, and in dicta—as "presumptively lawful." And if that fact didn't stop the *Bruen* Court from doing the full two-step analysis, it shouldn't stop this Court from doing the full two-step Bruen analysis, either. *Moore* is inconsistent with *Bruen* in that regard.

## II.     The First Step Of The *Bruen* Analysis.

The government first argues that "felons do not fall within 'the people' protected by the Second Amendment" and that this term is limited to "'members of the political community.'" ECF 50 at 10-11. That is wrong.

For starters, *Heller* held that, as used in the Second Amendment, "the people" includes "all Americans" and everyone who is "part of [the] national community." 554 U.S. at 580-81. And *Bruen* reaffirmed that "all Americans" enjoy Second Amendment rights. 597 U.S. at 70. Felons meet these definitions, and the government neither suggests otherwise nor explains why this Court should disregard these portions of *Heller*'s definition of "the people."

But even if the Court reads one part of that definition ("the political community") to the exclusion of others, felons still fall within the Second Amendment's plain text. *Heller* contrasts two different sets of constitutional provisions that refer to "the people." First, several constitutional amendments (the First, Second, Fourth, and Ninth) protect a "right" of "the people." *Heller*, 554 U.S. at 579. As used in those provisions, "the people" refers to "individual rights" that are "exercised individually and belong[] to all Americans," *i.e.*, "all members of the political community." *Id.* at 579-81. Second, three other passages mention "'the people' in a context other than 'rights.'" *Id.* at 579. These latter provisions "refer to 'the people' acting collectively" and "deal with the exercise or reservation of powers." *Id.* at 579-80. To the extent this usage of "the people" involves "rights" at all, they are not "individual rights," but rather "'collective' rights" that "may be exercised only through participation in some corporate body." *Id.* at 579.

*Heller*'s central holding is that the Second Amendment falls in the first category: it codifies an "individual right" that belongs to "all Americans" and does not depend on service in a "corporate body" such as the militia. *Id.* at 610. Conversely, *Heller* made clear that voting falls in the second category. Among the constitutional provisions that use "the people" collectively is Article I, § 2, which "provid[es] that 'the people' will choose members of the House [of Representatives]." *Id.* at 579. Voting, in other words, is a collective power (second category), not an individual right (first category). So, when *Heller* used "the political community" to describe

who enjoys the individual right to keep and bear arms protected by the Second Amendment, it was quite consciously using that term to mean something *different from* the class of people entitled to engage in the collective act of voting. The distinction between individual rights (like the right to bear arms) and collective powers (like voting) was the crux of *Heller*'s holding that the arms right is not limited to militia service. It would turn *Heller* on its head to conclude that felons can be denied their individual right to bear arms simply because they can be excluded from participating in the collective exercise of voting.

The government's sources illustrate its conceptual error. The reference to felons in Thomas Cooley's 1868 treatise appears in a discussion of voting—a "passage [that] doesn't actually say anything about the right to keep and bear arms." *United States v. Harrison*, 2023 WL 1771138, at *13 (W.D. Okla. Feb. 3, 2023). Indeed, Cooley's treatise contains a separate section "exclusively devoted to the right to keep and bear arms," but that section "says nothing about the exclusion of felons." *Id.* at *13 n.69. That's because, as *Heller* made clear, "the people" who may bear arms are not coextensive with "the people" who may vote.

In addition, the government insists "the term 'people' need not bear precisely the same meaning in the Second Amendment that it does in the First and Fourth Amendments," notwithstanding that *Heller* described "the people" as "a term of art" bearing a uniform meaning across all those amendments. 554 U.S. at 580. The only support the government offers for this theory of inconsistent usage is a reference to *Heller*'s statement that felon-disarmament laws are "presumptively lawful." This portion of *Heller* is dicta—unexplained, unsupported, factually erroneous dicta at that. And it would be particularly odd to rely on this footnoted dictum when it conflicts with another portion of *Heller* that was essential to the case's holding—namely, that "the people" refers to "*all* Americans." 554 U.S. at 580-81. Besides, to the extent a (hypothetical)

history of felon-disarmament laws is relevant at all, it bears on "the Nation's historical tradition of firearm regulation" at *Bruen* step two, not "the Second Amendment's plain text" at *Bruen* step one. 597 U.S. at 24.

This Court should join the growing number of courts to hold felons are among "the people" for Second Amendment purposes. *E.g.*, *United States v. Carrero*, 2022 WL 9348792, at *2 (D. Utah Oct. 14, 2022); *United States v. Williams*, 2022 WL 18285005, at *2 (N.D. Ga. Nov. 14, 2022); *United States v. Goins*, 2022 WL 17836677, at *5 (E.D. Ky. Dec. 21, 2022); *Campiti v. Garland*, 2023 WL 143173, at *3 (D. Conn. Jan. 10, 2023); *United States v. Hester*, No. 1:22-cr-20333-RNS, ECF No. 39 (S.D. Fla. Jan. 27, 2023); *United States v. Barber*, 2023 WL 1073667, at *5-6 (E.D. Tex. Jan. 27, 2023).

The government's other sources do not support its atextual reading of the Second Amendment.

*First*, the government relies on the 1689 English Bill of Rights for the proposition that, at the time the Second Amendment was enacted, it was not meant to extend to "lawbreakers." ECF 50 at 11-13. The government is incorrect there, too. The English Bill of Rights provided "'[t]hat the Subjects which are *Protestants*, may have Arms for their Defence suitable to their Conditions, and *as allowed by Law*.'" *Heller*, 554 U.S. at 593 (quoting 1 W. & M., ch. 2, § 7) (emphasis added). As the italicized language demonstrates, the English Bill of Rights contained textual limitations that appear nowhere in the Second Amendment. The Second Amendment's Framers chose broader, more rights-protective language that did not reflect the restrictions of England circa 1689. *See Kanter v. Barr*, 919 F.3d 437, 457 n.5 (7th Cir. 2019) (Barrett, J., dissenting) ("[T]he right protected by the Second Amendment was decidedly broader than the one protected in the English Bill of Rights.").

*Heller*'s account of history confirms this conclusion. Notwithstanding the English Bill of Rights, King George III in the 1760s and 1770s "began to disarm the inhabitants of the most rebellious areas" of the colonies whom he considered dangerous. *Heller*, 554 U.S. at 594 (equating these disarmaments with "what the Stuarts had tried to do to their political enemies"); *see id.* at 592-93 (explaining Stuarts used militias to "disarm[] their opponents" and "political dissidents"). King George's effort "provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms." *Id.* at 594. In other words, the drafters and ratifiers of the Second Amendment believed either that general dangerousness-based disarmaments violated the English Bill of Rights, or that the Bill of Rights did not go far enough in protecting their right to keep and bear arms. Either way, the government errs by pegging the scope of the Second Amendment to the English Bill of Rights.

*Second,* the government relies on concurrences and dissents in *Bruen* to buttress its argument regarding felon-disarmament laws. But relying on *Bruen*'s concurrences and dissents to uphold § 922(g)(1) would amount to "honor[ing] an advisory opinion on an issue that was not before the Supreme Court." *United States v. Bullock*, ___ F. Supp. 3d ___, 2023 WL 4232309, at *20 (S.D. Miss. June 28, 2023). That "is no substitute for applying the new legal standard announced in *Bruen*." *Id.*; *see also, e.g.*, *United States v. Williams*, 2024 WL 731932, at *6 n.9 (E.D. Mich. Feb. 22, 2024) ("This Court is bound by the majority opinion in *Bruen* and its instructions to apply the [text-and-history framework]. Therefore, the Court will not decide Defendant's motion based on the views on *Heller* expressed by the Justices in *Bruen*'s concurring and dissenting opinions, which are not binding authority."); *United States v. Levasseur*, 2023 WL 6623165, at *4 n.6 (D. Me. Oct. 11, 2023) (declining to follow *Bruen* concurrences and dissent because "[w]hen it comes to interpreting the holding of Supreme Court opinions, the whole is

greater than the sum of its parts"); *United States v. Jackson*, 85 F.4th 468, 478 (8th Cir. 2023) (Stras, J., dissenting from denial of rehearing en banc) ("Reading the tea leaves from dicta in . . . separate opinions is no substitute for faithful application of a majority opinion that commanded six votes."); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2176 (2023) ("A dissenting opinion is generally not the best source of legal advice on how to comply with the majority opinion."); *cf. Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, ___ F. Supp. 3d ___, 2023 WL 3355339, at *9 n.11 (E.D. Va. May 10, 2023) (noting a statement in Justice Alito's *Bruen* concurrence, and adding, "However, in so stating, Justice Alito did not conduct a historical analysis. Because that observation is in a concurrence and is a cursory comment at that, the Court notes it but gives it no analytical weight.").

### III.   The Second Step Of The *Bruen* Analysis.

*First*, the government claims that § 922(g) is consistent with the country's historical tradition of firearm regulation because "§ 922(g) fits comfortably within the nation's longstanding tradition of disarming unvirtuous or dangerous citizens." ECF 50 at 14. This argument rests on similar errors. *Heller* decisively rejected the civic-right / virtuous-citizens theory of the Second Amendment. *See Folajtar v. Att'y Gen.*, 980 F.3d 897, 916-18 (3d Cir. 2020) (Bibas, J., dissenting) (noting "virtue" theory rests on the idea that Second Amendment protects a "civic," "collective" right—an idea that "conflicts with" and was "rejected by" *Heller*); *Koons v. Platkin*, 2023 WL 3478604, at *19 (D.N.J. May 16, 2023) ("[T]he 'virtuous citizen' theory of the Second Amendment views the right to right to keep and bear arms as a 'civic' one, and those who lack respect for government authority, say by committing non-violent crimes, are deemed 'unvirtuous' and unworthy to have arms. That theory appears to lack historical support, rests on faulty justifications, and has come under fire."). "[T]he Government has presented no evidence that virtue

exclusions ever applied to *individual* rights, which (now) undeniably include the Second Amendment's guarantee of the right to keep and bear arms." *United States v. Leblanc*, 2023 WL 8756694, at *9 (M.D. La. Dec. 19, 2023) (emphasis in original).

*Second*, the government argues that *Bruen* did not distinguish between "relevantly similar" regulations and "distinctly similar" regulations. That argument plainly misreads *Bruen*, as a growing number of courts around the country have recognized. *E.g.*, *Range v. Att'y Gen.*, 69 F.4th 96, 103 (3d Cir. 2023) (en banc); *United States v. Daniels*, 77 F.4th 337, 342-43 (5th Cir. Aug. 9, 2023); *United States v. Brown*, No. 222CR00239JNPCMR, 2023 WL 4826846, at *7-8 (D. Utah July 27, 2023); *United States v. Marique*, No. CR 22-00467-PJM, 2023 WL 5338069, at *2 (D. Md. Aug. 18, 2023); *Koons*, 2023 WL 3478604, at *82; *Fraser*, 2023 WL 3355339, at *21; *Worth v. Harrington*, No. 21-CV-1348 (KMM/LIB), 2023 WL 2745673 (D. Minn. Mar. 31, 2023); *United States v. Ryno*, No. 3:22-cr-45-JMK0MMS, ECF No. 54 at 11 (D. Alaska Feb. 22, 2023); *United States v. Lewis*, No. CR-22-368-F, 2023 WL 187582, at *3 (W.D. Okla. Jan. 13, 2023); *United States v. Robertson*, No. 22-PO-867-GLS, 2023 WL 131051, at *2, *6 n.4 (D. Md. Jan. 9, 2023); *United States v. Perez-Gallan*, No. PE:22-CR-00427-DC, 2022 WL 16858516, at *8 (W.D. Tex. Nov. 10, 2022).

*Third*, the government unpersuasively relies on *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1046 (4th Cir. 2023). The Fourth Circuit did not, in that case, reject Mr. Smith's argument regarding the "distinctly similar" and "relevantly similar" historical tests. The state defendants in *Maryland Shall Issue* did not acknowledge, much less engage with, that argument in any way. Indeed, neither word—"distinctly" or "relevantly"—appears even once in Maryland's brief. *See* No. 21-2017, Dkt. 38. Nor do words like "persisted since the 18th century," "general societal problem," "unprecedented," "unimaginable," or "dramatic technological changes."

*Contra Bruen*, 142 S. Ct. at 2131-32. Instead, Maryland's brief relied almost exclusively on *Bruen*'s footnote nine and a high-level discussion of a supposed tradition of disarming those who are not "law-abiding, responsible citizens."

More important, the *Maryland Shall Issue* opinion also did not acknowledge or engage with the challengers' argument about the difference between "distinctly similar" and "relevantly similar." The court simply applied the "relevantly similar" test without any discussion of why that test was appropriate—and without recognizing that the challengers had argued for a different standard. *See* 2023 WL 8043827, at *6-8.

Accordingly, *Maryland Shall Issue* does not settle this issue, since a prior case is not binding as to an issue that "was not contested." *United States v. Norman*, 935 F.3d 232, 240 (4th Cir. 2019). Even "with respect to perhaps the most essential antecedent issue — jurisdiction"— courts are "not bound by cases that assumed that jurisdiction existed . . . or *so stated without analysis*. This is so because, under our adversarial system of justice, an unchallenged and untested assumption is simply not a holding that binds future courts." *Id.* at 241 (emphasis in original); *see also id.* at 240 ("Since we have never squarely addressed the issue, and have at most assumed it, we are free to address the issue on the merits.").

*Fourth*, the government points to the 1689 English Bill of Rights as a "relevantly similar" historical analogue. The Second Amendment's text contains neither of the restrictions highlighted contained in its English precursor: it applies to "all Americans," not just a particular religious group (Protestants), *Bruen*, 597 U.S. at 70, and it contains no "as allowed by Law" proviso. As explained above, the Framers chose different language that did not reflect the limitations of England circa 1689. *See Kanter*, 919 F.3d at 457 n.5 (Barrett, J., dissenting) ("[T]he right protected by the Second Amendment was decidedly broader than the one protected in the English Bill of Rights.").

*Fifth*, the government points to a treatise from Thomas Cooley. Cooley's reference to lunatics appears in a "passage [that] doesn't actually say anything about the right to keep and bear arms," *United States v. Harrison*, 654 F. Supp. 3d 1191, 1207 (W.D. Okla. 2023), but instead addresses voting rights, *see* Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1st ed. 1868). Indeed, Cooley's treatise contains a separate section "exclusively devoted to the right to keep and bear arms," but that section "says nothing about the exclusion of felons." *Harrison*, 654 F. Supp. 3d at 1207 n.69; *see* Cooley, *A Treatise*, at 350. That is unsurprising. As the government recognizes, the portion of Cooley's treatise it cites deals with "civic rights," *i.e.*, "individual rights that require citizens to act in a collective manner for distinctly public purposes." *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting). Voting and jury service involve civic rights, for example, because citizens "cast votes as part of the collective enterprise of self-governance" and serve on juries "as part of the collective enterprise of administering justice." *Id.* Although some scholars have characterized the Second Amendment right as a civic/collective right, *Heller* adopted the individual-rights view and "expressly reject[ed] the argument that the Second Amendment protects a purely civic right." *Id.* at 463. So Cooley had no occasion, in his discussion of civic rights, to address the scope of the right to bear arms.

*Sixth*, the government points to a number of laws that were passed disarming certain groups, like slaves, Native Americans, and Catholics. This argument fails for a number of reasons:

- Unlike § 922(g)(1), those laws did not impose categorical bans on firearm possession, but instead allowed a member of the group to retain arms as long as they swore an oath of allegiance or were for self-defense. *See United States v. Alston*, No. 523CR00021FLRN1, 2023 WL 4758734, at *19 (E.D.N.C. July 18, 2023).

- The laws were not "comparably justified" relative to § 922(g)(1), as the purpose of Catholic-disarmament statutes was "to preclude armed insurrections" and rebellion by a group considered "disloyal and seditious," Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 258-60, 263 (2020), and laws aimed at slaves were meant to neutralize "people thought to pose a threat to the security of the state due to their perceived lack of loyalty or societal status," *United States v. Rahimi*, 59 F.4th 163, 175 (5th Cir. 2023); *see also* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo–American Right* 140 (1994) (noting slave-disarmament laws were motivated by perceived "need for racial control").

- The bans on firearm possession by slaves and Native Americans did not impose as severe a burden as § 922(g)(1). "Enslaved people could possess firearms if they had permission from their master," and "state legislatures typically prohibited the *sale* of firearms to Native Americans, not *possession* itself." *United States v. Prince*, ___ F. Supp. 3d ___, 2023 WL 7220127, at *7 (N.D. Ill. Nov. 2, 2023) (second emphasis added).

- "[N]either slaves nor Indians were understood to be part of the 'political community' of persons protected by the Second Amendment," *Harrison*, 2023 WL 1771138, at *20, so restrictions on their rights tell us nothing about the scope of arms-bearing permitted persons who were among "the people." *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) (same).

- Regardless, the cited laws do not add up to a "well-established and *representative* historical" tradition, as *Bruen* "doubt[ed]" that regulations from three out of thirteen colonies were sufficient to establish a historical tradition. 597 U.S. at 30, 45. The

11

government has cited only a small handful of statutes disarming slaves, Catholics, or Native Americans—far from a sufficient number under *Bruen*.

*Seventh*, the government cites several Revolution-era laws that required those who refused to take an oath of allegiance to the state to give up their firearms. This argument has been rejected by numerous courts. *Alston*, 2023 WL 4758734, at *18-19; *Prince*, 2023 WL 7220127; *United States v. Taylor*, No. 23-CR-40001-SMY, 2024 WL 245557, at *5 (S.D. Ill. Jan. 22, 2024); *United States v. Williams*, No. 23-CR-20201, 2024 WL 731932, at *17-18, *21 (E.D. Mich. Feb. 22, 2024); *United States v. Neal*, No. 20 CR 335, 2024 WL 833607, at *9 n.10 (N.D. Ill. Feb. 7, 2024).

That is for good reason. These statutes and § 922(g)(1) do not impose a "comparable burden" on the right to keep and bear arms. *Bruen*, 142 S. Ct. at 2133. People disarmed under loyalty statutes could regain the arms right at any time simply by swearing a loyalty oath, *see* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 157 (2007), whereas § 922(g)(1) defendants have no similar ability to restore their own right to arms whenever they choose. And even when states took arms away from someone who refused the oath, that person was free to acquire new, additional firearms—unlike a § 922(g)(1) defendant. *See* C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 724 (2009) (explaining loyalty statutes "did not technically prohibit recusants from acquiring new arms," since they "read more like forfeiture laws than disabilities").

Loyalty statutes also were not "comparably justified." *Bruen*, 597 U.S. at 29. Unlike § 922(g)(1), which seeks to prevent interpersonal violence, the loyalty statutes were meant to neutralize those "considered dangerous to the *state*," *i.e.*, those who might rebel or otherwise undermine the stability of government because of their loyalty to Great Britain. Saul Cornell &

12

Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506-07 (2004) (emphasis added); *see* Greenlee, 20 Wyo. L. Rev. at 265 ("Like the English, and out of similar concerns of violent insurrections, the colonists disarmed those who might rebel against them.").

*Eighth*, the government contends § 922(g)(1) is analogous to historical laws that made certain civic rights" such as voting and jury service, subject to forfeiture by individuals convicted of crimes. ECF 50 at 17. As explained above, however, *Heller* "expressly rejects the argument that the Second Amendment protects a purely civic right," i.e., a right that "requires citizens to act in a collective manner for distinctly public purposes." *Kanter*, 919 F.3d at 462-63 (Barrett, J., dissenting). *Heller* held the Second Amendment protects "an individual right unconnected with militia service," rather than a "collective" right that "may be exercised only through participation in some corporate body." 554 U.S. at 579, 605. Thus the right to bear arms is not a "civic" right, and laws excluding felons from exercising civic rights are irrelevant to the Second Amendment.

## IV.   Conclusion

For the reasons described above, the Court should dismiss the indictment as violative of the Second Amendment, both facially and as applied to Mr. Smith. *See Prince*, 2023 WL 7220127, at *11 (holding § 922(g)(1) violates Second Amendment on its face); *Neal*, 2024 WL 833607, at *5 (same); *Taylor*, 2024 WL 245557, at *5 (same).

James Wyda
Federal Public Defender
for the District of Maryland


                    /s/
Maggie Grace
Francisco Carriedo
Assistant Federal Public Defender
100 S. Charles Street
Tower II, Ninth Floor
Baltimore, MD 21201

(410) 962-3962
maggie_grace@fd.org
Francisco_carriedo@fd.org