IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|                          |   |                            |
|--------------------------|---|----------------------------|
| UNITED STATES OF AMERICA | * |                            |
| v.                       | * | Criminal No. RDB-23-0126   |
| AL TARIQ SMITH,          | * |                            |
| *Defendant.*             | * |                            |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## **MEMORANDUM OPINION**

Defendant Al Tariq Smith was arrested after he was found asleep in the driver's seat of a vehicle at a gas pump with a loaded handgun in plain view on the center console. Because he had prior felony convictions, Smith was indicted for possession of ammunition by a prohibited person under 18 U.S.C. § 922(g).[1] He now moves in limine to admit portions of the officers' body-worn camera footage. (ECF No. 70.) Those portions include statements he made during and immediately following his arrest. The parties' submissions have been reviewed, and this Court held a hearing on the motion on July 29, 2024. *See* Local R. 105.6 (D. Md. 2023). For the reasons set forth below, Smith's Motion in Limine to Admit Portions of Law Enforcement Body-Worn Camera Footage (ECF No. 70) is GRANTED.

---

[1] Under 18 U.S.C. § 922(g)(1), "It shall be unlawful for any person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year . . . to [ship, transport, possess, or receive] any firearm or ammunition." A Superseding Indictment was returned on July 25, 2024. (ECF No. 79.) That indictment charges Smith with one count of possession of **a firearm and** ammunition by a prohibited person, in violation of 18 U.S.C. § 922(g)(1). (*Id.*) During the July 29, 2024 hearing, Smith filed an objection to the Superseding Indictment. (ECF No. 88.) The Court subsequently set a schedule for briefing on Defendant's motion to dismiss or amend the Superseding Indictment via Letter Order dated July 29, 2024. (ECF No. 90.)

**BACKGROUND**

The following facts were previously recounted in this Court's Memorandum Opinion (ECF No. 66) and have been supplemented with details relevant to the presently pending motion. On January 17, 2023, at around 9:07 a.m., a Baltimore City 911 caller reported that a gray Jeep had been parked at pump six at the Clark gas station since 2:00 a.m. with someone inside. (ECF No. 48 at 3–4.) The dispatcher noted that the caller sounded concerned. (ECF No. 48-2 at 1.) At approximately 9:22 a.m., officers with the Baltimore Police Department responded to the Clark gas station (located at 1101 West North Avenue, Baltimore City, Maryland) for a wellness check on the person reported to be in the Jeep. (ECF No. 48 at 4–7.) Baltimore City Police Officer Dollard parked next to the Jeep, and Officer Austin parked next to the sidewalk away from the gas pumps. (*Id.* at 4.) Officer Gibbs parked near the convenience store. (*Id.*)

Officer Dollard approached the driver's side of the Jeep and observed Defendant Al Tariq Smith unresponsive in the driver's seat. (*Id.* at 7.) The doors were locked and no one else was inside of the vehicle. (*Id.*) Officer Gibbs approached the front passenger side window. (*Id.*) Officer Dollard attempted to rouse Smith by repeatedly knocking on the window, asking if Smith was okay, and requesting that he wake up. (*Id.*) Officer Gibbs observed a black handgun in plain view on top of the center console. (*Id.*) Officer Gibbs said to Officer Dollard, "hey, he's got a gun." (*Id.*) Officer Gibbs then drew his own firearm. (*Id.*) Officer Dollard continued to try to wake up Smith, who eventually woke up and unlocked the door. (*Id.*) Officer Dollard opened the driver's door and ordered Smith out of the vehicle. (*Id.*) Officer Dollard removed Smith's seatbelt and grabbed Smith's arm as Smith got out of the vehicle.

(*Id.*) Officer Austin approached from the rear of the vehicle and handcuffed Smith upon his exit from the vehicle. (*Id.* at 8.) The officers believed that Smith was under the influence of alcohol or drugs due to his demeanor and the presence of a half empty bottle of liquor next to the gun. (ECF No. 63 at 7.) Officer Gibbs recovered Smith's handgun—a black Polymer80 Inc. model PF940C 9mm that lacked a serial number—and determined that it was loaded. (ECF No. 48 at 8.) He rendered the weapon safe. (*Id.*) The officers then learned Smith's identity and that he was prohibited from possessing a firearm due to prior convictions. (ECF No. 36 at 2.)

Smith seeks to admit Officer Dollard and Officer Austin's body-worn camera footage from 9:22:26 a.m. to approximately 9:32:10 a.m. (ECF No. 70 at 3.) This portion of the body-worn camera footage captures the officers' arrival at the gas station, observation of the gun, and arrest of Smith. It also captures Smith's reactions to and interactions with the officers. Smith was pulled out of the car at 9:24:00 a.m. Handcuffs were placed on him by 9:24:15 a.m. Smith made the following statements at the following timestamps:

- 09:24:33 – "Yo, how did a gun get in here?"

- 09:24:40 – "How did a gun get in here? I just dropped someone off over there."

- 09:25:10 – "How did a gun get in the car?"

- 09:25:26 – "I'm good bro. I don't know how that gun get in here. I just got a hack[2] and we came up here."

- 09:25:37 – "The person was dropped right here. I just…"

---

[2] Colloquially, a "hack" refers to a person who pays for someone to drive them somewhere, similar to an informal taxi or Uber service.

- 09:25:58 – "Where did that gun come from?"

- 09:26:30 – "Where did that gun come from?"

- 09:27:10 – "Where the fuck did a gun come from?"

- 09:28:32 – "I don't know where the hell that gun came from. It ain't mine."

- 09:30:07 – "I don't even know where that fucking gun came from."

- 09:30:11 – "I just caught someone here for a fucking hack man."

- 09:30:19 – "Check that fucking gun, my hands ain't on that."

- 09:32:11 – "I wake up, there's a fucking gun in the car. Like where'd a fucking gun come from? Check that shit, check that shit for my shit, and, and like I dropped someone here for a fucking hack."

(ECF No. 75 at 14.) At the July 29, 2024, hearing, this Court determined that these statements were offered for the truth of the matter asserted and that accordingly they are hearsay as defined in Rule 801(c) of the Federal Rules of Evidence. This Court took the matter under advisement to determine whether the statements qualified as excited utterances, exceptions to the bar against hearsay as set forth in Rule 803.

## ANALYSIS

Under Federal Rule of Evidence 802, "[h]earsay is not admissible unless" a federal statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court "provide[] otherwise." Hearsay is defined as "a statement that" (1) "the declarant does not make while testifying at the current trial or hearing," and (2) "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). In short, hearsay is an "[o]ut-of-court statement . . . offered [for] the truth of the matter asserted." *In re C.R.*

*Bard, Inc., MDL. No. 2187, Pelvic Repair Sys. Prod. Liab. Litig.*, 810 F.3d 913, 925–26 (4th Cir. 2016). A "statement" is "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a). A "statement that would otherwise be hearsay may nevertheless be admissible if it is offered to prove something other than" "the truth of the matter asserted." *In re C.R. Bard*, 810 F.3d at 926.

Federal Rule of Evidence 803(2) excepts from the rule against hearsay "excited utterances." An excited utterance is a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). "To qualify under the excited utterance exception, (1) the declarant must have experienced a startling event or condition; (2) she must have related the statement while under the stress or excitement of that event or condition, not from reflection; and (3) the statement or utterance must have related to the startling event or condition." *United States v. Jennings*, 496 F.3d 344, 349 (4th Cir. 2007); *see also Chestnut v. Ford Motor Co.*, 445 F.2d 967, 972 (4th Cir. 1971) ("Hearsay statements are admissible if they are 'uttered under stress of excitement produced by a startling event and made before the declarant has had time or opportunity to reflect or contrive.'" (citing C. McCormick, *Law of Evidence* § 275 (1954))). The premise for the exception is that "such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and that cross-examination would be superfluous." *Idaho v. Wright*, 497 U.S. 805, 820 (1990). In other words, courts assume "that an excited declarant will not have had time to reflect on events to fabricate" and that "errors in memory will have had less time to accumulate." *Jennings*,

5

496 F.3d at 349 (quoting *Morgan v. Foretich*, 846 F.2d 941, 946 (4th Cir. 1988)). "At bottom, the analysis must focus on whether the declarant's statement was trustworthy by being made in circumstances where it would not be reasonable to conclude that the declarant fabricated the statement or incorrectly remembered the events related." *Jennings*, 496 F.3d at 350 (quoting *Morgan*, 846 F.2d at 947–48).

To determine whether the statement was made under the stress or excitement of the event, courts consider "relevant factors such as '(1) the lapse of time between the event and the declarations; (2) the age of the declarant; (3) the physical and mental state of the declarant; (4) the characteristics of the event; and (5) the subject matter of the statements.'" *Jennings*, 496 F.3d at 349 (quoting *Morgan*, 846 F.2d at 947). "The lapse of time between the event and the declaration is just one of several factors to consider in the analysis." *Jennings*, 496 F.3d at 350 (citing *Morgan*, 846 F.2d at 947). "[T]he crucial question in determining whether a statement qualifies as an excited utterance is '[w]hether the statement was the result of reflective thought or whether it was a spontaneous reaction to the exciting event.'" *United States v. Ayoub*, 701 F. App'x 427, 436 (6th Cir. 2017) (second alteration in original) (quoting *United States v. Arnold*, 486 F.3d 177, 184 (6th Cir. 2007)).

Although there is no binding Fourth Circuit precedent on the circumstances of this case, the Government has referenced the opinion of the United States Court of Appeals for the Eighth Circuit in *United States v. Esparza*, 291 F.3d 1052, 1055 (8th Cir. 2002). The Eighth Circuit in that case referenced its earlier opinion in *United States v. Sewell*, 90 F.3d 326, 327 (8th Cir. 1996). In *Sewell*, the defendant (a thrice-convicted felon) was arrested after ammunition was found in his possession during a traffic stop. He claimed to have no knowledge of the

6

ammunition. At trial, he sought to admit his statement denying knowledge as an excited utterance. The court concluded the following:

> Defendant's argument that he was merely reacting naturally to the "shock" of an "extraordinarily startling event"-i.e., the discovery of a weapon in his possession-is unconvincing. Where incriminating evidence is discovered in one's possession, it requires only the briefest reflection to conclude that a denial and plea of ignorance is the best strategy. This hardly comports with the spirit of disinterested witness which pervades the rule. There is no evidence that the defendant's self-serving statement derived from an uncontrolled "excitement" experienced while learning of the evidence against him.

*Id.* at 327. The Eighth Circuit reiterated the central notion of *Sewell* in *Esparza*. 291 F.3d at 1055 ("Police discovery of contraband is ordinarily not the kind of 'startling event' to which this exception applies. As we explained in *Sewell*, when 'incriminating evidence is discovered in one's possession, it requires only the briefest reflection to conclude that a denial and plea of ignorance is the best strategy.'") However, *Sewell* and *Esparza* are not necessarily controlling in this case.

In a case from the United States District Court for the District of New Hampshire, the defendant made a statement to prison personnel that "he had no choice" following an alleged assault. *See United States v. Hayes*, 561 F. Supp. 3d 154, 160 (D.N.H. 2019). The court admitted the statement under the excited utterance exception because it was "made just after the alleged assault, and concerned those events." *Id.* The government argued that the statement should not be admitted because it was self-serving, citing *Sewell* and *Esparza*. The court concluded otherwise, noting that "Hayes's excitement stemmed not merely from 'learning of the evidence against him,' but from the alleged physical confrontation." *Id.* (quoting *Sewell*, 90 F.3d at 327). At bottom, "[t]he apparently self-serving nature of [the defendant's] statement may affect its weight as evidence, but does not preclude its admission." *Hayes*, 561 F. Supp. 3d at 160. In

7

essence, the *Hayes* court concluded that the credibility of the statements is ultimately a decision for the jury. As the United States Court of Appeals for the Sixth Circuit has noted, "a statement that satisfies all of the elements of our test for excited utterances meets the threshold for admissibility under Rule 803(2), even though its reliability might be subject to challenge on such grounds as inconsistency with subsequent statements or the speaker's motive to fabricate." *United States v. Hadley*, 431 F.3d 484, 498 (6th Cir. 2005).

In this case, the startling event was not only the police discovery of contraband, but also the police rousing Smith from his sleep and immediately arresting him. *See Ayoub*, 701 F. App'x at 437 ("[P]hysical factors such as shock, unconsciousness or pain, may prolong the period in which the risk of fabrication is reduced to an acceptable minimum." (alteration in original) (quoting *Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1058 (6th Cir. 1983))). Here, as in *Hayes*, the "excitement stemmed not merely from 'learning of the evidence against him, but from" being roused and arrested by the police. *Hayes*, 561 F. Supp. 3d at 160. The arrest on its own would likely be enough to qualify as a startling event. *See United States v. McCullough*, 150 F. App'x 507, 510 (6th Cir. 2005) (finding a startling event where an individual witnessed a companion being arrested).

The time between the startling event and the statements sought to be admitted is quite short. Courts have indeed found much longer periods of time to be permissible under the excited utterance exception. *See, e.g.*, *McCollough*, 150 F. App'x 510 (two-and-a-half hours); *United States v. Green*, 125 F. App'x 659, 662 (6th Cir. 2005) (three hours); *United States v. Alexander*, 331 F.3d 116, 123 (D.C. Cir. 2003) (15 to 20 minutes); *United States v. Cruz*, 156 F.3d 22, 30 (1st Cir. 1998) (four hours); *United States v. Tocco*, 135 F.3d 116, 128 (2d Cir. 1998) (three

8

hours). In this case, mere minutes passed between Smith's awakening and arrest and the statements. There is approximately a ten-minute period between Smith's arrest and the last statement sought to be admitted.

Smith's statements relate to the startling event because they concern the gun that was found in his car—the reason he was being arrested. It is true that these statements are of a self-serving nature. But as the *Hayes* and *Hadley* courts noted, it is ultimately the province of the jury to evaluate the credibility of excited utterances. The Federal Rules of Evidence provide for their admissibility, and the statements at issue here meet the criteria for admission under Rule 803(2). Doubts regarding the potential motives of the declarant do not vitiate the Rule. Under these circumstances, Smith's statements during and immediately following his arrest meet the excited utterance exception to the rule against hearsay. Accordingly, Smith's Motion in Limine to Admit Portions of Law Enforcement Body-Worn Camera Footage (ECF No. 70) is GRANTED.

## CONCLUSION

For the reasons stated above, Defendant's Motion in Limine to Admit Portions of Law Enforcement Body-Worn Camera Footage (ECF No. 70) is GRANTED.

A separate Order follows.

Dated: July 30, 2024

/s/
Richard D. Bennett
United States Senior District Judge